## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| BRIANA TABBS, individually and on behalf of others similarly situated, | Case No.: |
| *Plaintiff*, | Hon. |
| v. | **CLASS ACTION COMPLAINT** |
| Henry Ford Health System, | |
| *Defendant*. | JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Briana Tabbs, individually and on behalf of all others similarly situated ("Plaintiff"), brings this action against Defendant Henry Ford Health System ("Defendant" or "Henry Ford"). Plaintiff seeks to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Henry Ford. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record.

### I.      INTRODUCTION

1.      This class action arises out of the recent targeted cyberattack and data breach on Henry Ford's network that resulted in unauthorized access to highly sensitive patient health information and personal data. Plaintiff brings this class

action against Henry Ford for its failure to secure and safeguard her and approximately 168,000 other individuals' personally identifiable information ("PII") and personal health information ("PHI") (collectively, "Private Information"). Henry Ford concedes that the PHI and PII potentially accessed in the data breach includes: "name, gender, date of birth, age, lab results, procedure type, diagnosis, date of service, telephone number, medical record number and/or internal tracking number."[1]

2.     As a result, Plaintiff and Class Members suffered ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack, emotional distress, and the imminent risk of future harm caused by the compromise of their sensitive personal information.

3.     Henry Ford, one of the largest health systems in Michigan "is one of the nation's leading academic medical centers," and "is consistently ranked among the top NIH institutions in Michigan."[2] Henry Ford "provides a full continuum of services – from primary and preventative care, to complex and specialty care, health insurance, a full suite of home health offerings, virtual care, pharmacy, eye care and

---

[1]     https://www.henryford.com/-/media/files/hfh-patient-data-breach-substitute-notice-final-71423_pdf.pdf (last accessed July 21, 2023) (attached hereto as **Exhibit 1**).

[2]     https://www.henryford.com/about (last accessed July 21, 2023).

other healthcare retail."[3] Henry Ford "serves a growing number of customers across 250+ locations throughout Michigan including five acute care hospitals, two destination facilities for complex cancer and orthopedic and sports medicine care, three behavioral health facilities, primary care and urgent care centers."[4]

4. As a condition of receiving treatment or services, Henry Ford's patients are required to provide and entrust Henry Ford with sensitive and private information, including PII and PHI.

5. According to Henry Ford, on or around March 30, 2023, its systems were subject to a cyberattack via an email phishing scheme, whereby an unauthorized individual or individuals were able to access Henry Ford's business email accounts. Henry Ford reports that patient information was exposed in the compromised mailboxes and confirmed internally on May 16, 2023 that "protected health information was contained" in the compromised email boxes (the "Data Breach"). Ex. 1.

6. Henry Ford further stated that the compromised information "may have included the following: name, gender, date of birth, age, lab results, procedure type, diagnosis, date of service, telephone number, medical record number and/or internal tracking number." Ex. 1.

---

[3]    *Id.*
[4]    *Id.*

7.     On or around June 6, 2023, Henry Ford reported the Data Breach to U.S. Department of Health and Human Services Office for Civil Rights ("OCR"), reporting a "Hacking/IT" incident with its emails systems and that 500 individuals were impacted.[5]

8.     However, on or around July 17, 2023, Henry Ford admitted that approximately 168,000 individuals were actually impacted by the Data Breach.[6] To date, Henry Ford has failed to update the drastically higher number of impacted individuals to the OCR.

9.     Despite being aware of the Data Breach since at least May 16, 2023, Henry Ford did not post a notification on its website announcing the Data Breach until on or around July 14, 2023 (*see* Ex. 1) and began sending notifications to impacted individuals on or around July 14, 2023.[7]

10.     Henry Ford's notices provided scant detail, particularly considering the size and scope of the Data Breach and the sensitivity of Plaintiff's and Class Members' compromised PHI and PII. *See* Exs. 1 & 2. Henry Ford's notice states, in relevant part, that "an unauthorized individual conducted an email phishing scheme

---

[5]     https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed July 21, 2023).

[6]     https://www.clickondetroit.com/news/local/2023/07/17/henry-ford-health-confirms-data-breach-affecting-168000-patients/ (last accessed July 21, 2023).

[7]     *See* Notice Letter to Plaintiff Briana Tabbs (**Exhibit 2** hereto).

to gain access to business email accounts" and that "the improper access was quickly discovered and the email accounts were secured." *Id.*

11.    Henry Ford stated that "the incident occurred on March 30, 2023" and that it "immediately began an extensive investigation to determine what happened." *Id.*

12.    Henry Ford went on to state that "through our forensics investigation" Henry Ford "determined on May 16, 2023 that protected health information was contained in the email boxes and could have been accessed by the bad actor." *Id.*

13.    Thus, Henry Ford discovered that this Data Breach may have impacted protected health information ("PHI") or personally identifiable information ("PII"), such as "name, gender, date of birth, age, lab results, procedure type, diagnosis, date of service, telephone number medical record number and/or internal tracking number." *Id.*

14.    Henry Ford's notices did not disclose how it discovered the cybersecurity attack, how the phishing scheme was detected and terminated, the means and mechanisms of the cybersecurity attack, the reason for its four-month delay in notifying Plaintiff and the Class of the Data Breach after learning that Private Information was impacted, and, importantly, what steps Henry Ford took following the Data Breach to secure its systems and prevent future cyberattacks. *Id.*

15.    As noted above, Henry Ford reported that the scope of information involved includes name, gender, date of birth, age, lab results, procedure type, diagnosis, date of service, telephone number medical record number and/or internal tracking number. *Id.*

16.    And the notice offered the inadequate assistance consisting of a call center "that specializes in providing assistance for data security and cybersecurity incidents and services for other industries." *Id.*

17.    The Data Breach was a direct result of Henry Ford's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect individuals' PII and PHI from the foreseeable threat of a cyberattack.

18.    By taking possession and control of Plaintiff's and Class Members' PHI and PII for its own pecuniary benefit, Henry Ford assumed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class Members' PHI and PII against unauthorized access and disclosure. Henry Ford also had a duty to adequately safeguard this PHI and PII under industry standards and duties imposed by statutes, including HIPAA regulations and Section 5 of the Federal Trade Commission Act ("FTC Act"). Henry Ford breached that duty by, among other things, failing to implement and maintain reasonable security procedures and

practices to protect patients' and other individuals' PHI and PII from unauthorized access and disclosure.

19.     The exposure of a person's PII and PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. As a result of the Data Breach, Plaintiff and Class Members are at imminent and substantial risk of experiencing various types of misuse of their Private Information in the coming years, including but not limited to, unauthorized access to email accounts, tax fraud, and identity theft—including medical identity theft.

20.     Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take several additional prophylactic measures.

21.     There has been no assurance offered by Henry Ford that all impacted PHI and PII copies thereof have been recovered or destroyed.

22.     As a result of Henry Ford's inadequate security and breach of its duties and obligations, the Data Breach occurred, Plaintiff and over 168,000 Class Members, suffered injury and ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, loss of value of their time

reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their personal information from its exposure, emotional distress, and the present and imminent risk of fraud and identity theft caused by the compromise of their sensitive personal information. Plaintiff's and Class Members' sensitive PHI and PII—which was entrusted to Henry Ford, its officials, and its agents—was compromised and unlawfully accessed due to the Data Breach.

23.    The injury to Plaintiff and Class Members was compounded by the fact that Henry Ford did not notify patients and other individuals that their PHI and PII was subject to unauthorized access and exfiltration until on or around July 14, 2023, three-and-a-half months after the Data Breach was discovered and two months after determining that the Data Breach permitted access to protected health information. Henry Ford's failure to timely notify the victims of its Data Breach meant that Plaintiff and Class Members were unable to take affirmative measures to prevent or mitigate the resulting harm.

24.    Despite having been accessed and exfiltrated by unauthorized bad actor(s), Plaintiff's and Class Members' sensitive and confidential PHI and PII still remains in the possession of Henry Ford. Absent additional safeguards and independent review and oversight, the information remains vulnerable to further cyberattacks and theft.

25.     Henry Ford disregarded the rights of Plaintiff and Class Members by, *inter alia*, failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard PII/PHI of patients and other individuals; failing to take standard and reasonably available steps to prevent the Data Breach; failing to properly train its staff and employees on proper security measures; and failing to provide Plaintiff and Class Members prompt and adequate notice of the Data Breach.

26.     In addition, Henry Ford and its employees failed to properly monitor the computer network and systems that housed the Private Information. Had Henry Ford properly monitored these electronic systems, it would have discovered the intrusion sooner or prevented it altogether.

27.     The security of Plaintiff's and Class Members' identities is now at risk because of Henry Ford's wrongful conduct as the Private Information that Henry Ford collected and maintained is now in the hands of data thieves. This present risk will continue for the course of their lives.

28.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to actual fraud and identity theft as well as a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future

closely monitor their financial accounts to guard against further fraud and identity theft.

29.     Plaintiff and Class Members may also incur out of pocket costs for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

30.     Plaintiff and Class Members will also be forced to expend additional time to review credit reports and monitor their financial accounts and medical records for fraud or identity theft. Due to the fact that the affected email accounts contained protected health information and other immutable personal details, Plaintiff and Class Members will be at risk of identity theft and fraud that will persist throughout the rest of their lives.

31.     Plaintiff brings this action on behalf of herself and individuals in the United States whose Private Information was exposed as a result of the Data Breach, which occurred on or about March 30, 2023, and which Henry Ford only first publicly acknowledged on or about July 14, 2023. Plaintiff and Class Members seek to hold Henry Ford responsible for the harms resulting from the massive and preventable disclosure of such sensitive and personal information. Plaintiff seeks to remedy the harms resulting from the Data Breach on behalf of herself and all similarly situated individuals whose Private Information was accessed and exfiltrated during the Data Breach.

32.     Plaintiff thus seek remedies including, but not limited to, compensatory damages, treble damages, punitive damages, reimbursement of out-of-pocket costs, and declaratory and injunctive relief including improvements to Henry Ford's data security systems, future annual audits, and adequate credit monitoring services funded by Henry Ford.

## II.     THE PARTIES

**Plaintiff**

33.     Plaintiff Briana Tabbs is a resident and citizen of the State of Michigan. Plaintiff Tabbs is a patient of Defendant Henry Ford and has visited as recently as March 2023. Ms. Tabbs received a letter from Henry Ford Health System, dated July 14, 2023, that her "protected health information" may "have been accessed" via a phishing scheme. Ex. 2.

34.     Plaintiff Tabbs plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her accounts for any unauthorized activity.

**Defendant**

35.     Defendant Henry Ford Health System is a Michigan corporation with its principal place of business located at One Ford Place, Detroit, Michigan 48202.

## III.     JURISDICTION AND VENUE

36.     This Court has jurisdiction over Plaintiff's and the Class's claims under

28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class Members; (b) at least one Class Member is a citizen of a state that is diverse from Henry Ford; and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

37.    This Court has personal jurisdiction over the Defendant named in this action because Henry Ford is headquartered in this District and Henry Ford conducts substantial business in Michigan and this District through its headquarters, hospitals, offices, and affiliates.

38.    Venue is proper in this District under 28 U.S.C. §1391(b) because Henry Ford is headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    *Henry Ford Health System's Business*

39.    Since 1915, Henry Ford has provided medical services in the State of Michigan.[8] With over 30,000 employees, Henry Ford Health is one of the largest employers in the State of Michigan.[9]

---

[8]    https://www.henryford.com/about/culture/history/hfhs (last accessed July 21, 2023).

[9]    https://www.henryford.com/about/culture/history/hfhs/breakthrough (last accessed July 21, 2023).

40.     Henry Ford includes 6 hospitals and 27 Henry Ford Medical Centers, and it receives 4.2 million patient visits annually, and records approximately $5.7 billion in revenues annually.[10]

41.     Henry Ford claims that "employees and physicians take seriously the Henry Ford Health's mission to provide exceptional quality, cost effective care strengthened by education and research, carrying on the traditions of the founder and the original staff of the Henry Ford Hospital." *Id.*

42.     As a condition of providing medical care, Henry Ford requires that its customers entrust it with Private Information. On information and belief, in the ordinary course of medical care and medical billing, Henry Ford maintains the Private Information of its patients.

43.     Additionally, Henry Ford may receive Private Information from other individuals and/or organizations that are part of a patient's "circle of care," such as referring physicians, customers' other doctors, customers' health plan(s), close friends, and/or family Members.

44.     Because of the highly sensitive and personal nature of the information Henry Ford acquires and stores with respect to patients and other individuals, Henry Ford, upon information and belief, promises to, among other things: keep customers' PHI private; comply with healthcare industry standards related to data security and

---

[10]     *Id.*

Private Information; inform customers and patients of legal duties and comply with all federal and state laws protecting customers' and patients' Private Information; only use and release customers' Private Information for reasons that relate to medical care and treatment; and provide adequate notice to customers if their Private Information is disclosed without authorization.

45.     As a HIPAA covered business entity (*see infra*), Henry Ford is required to implement adequate safeguards to prevent unauthorized use or disclosure of Personal Information, including by implementing requirements of the HIPAA Security Rule and to report any unauthorized use or disclosure of Personal Information, including incidents that constitute breaches of unsecured protected health information as in the case of the Data Breach complained of herein.

46.     However, Henry Ford did not maintain adequate security to protect its systems from infiltration by cybercriminals, and it waited nearly four months to disclose the Data Breach publicly.

47.     Plaintiff and Class Members included patients of Henry Ford, and individuals with a potential or actual employment relationship who entrusted Henry Ford with their Private Information.

**B. Henry Ford Is a HIPAA Covered Entity**

48.     Henry Ford is a HIPAA covered entity that provides healthcare services. As a regular and necessary part of its business, Henry Ford collects and

custodies the highly sensitive PII of its clients' patients and health plan Members. Henry Ford is required under federal and state law to maintain the strictest confidentiality of the patient's Private Information that it requires, receives, and collects, and Henry Ford is further required to maintain sufficient safeguards to protect that Private Information from being accessed by unauthorized third parties.

49.     As a HIPAA covered entity, Henry Ford is required to ensure that it will implement adequate safeguards to prevent unauthorized use or disclosure of Private Information, including by implementing requirements of the HIPAA Security Rule and to report any unauthorized use or disclosure of Private Information, including incidents that constitute breaches of unsecured protected health information as in the case of the Data Breach complained of herein.

50.     Due to the nature of Henry Ford's business, providing medical services, Henry Ford would be unable to engage in its regular business activities without collecting and aggregating Private Information that it knows and understands to be sensitive and confidential.

51.     By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class Members' Private Information, Henry Ford assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

52.     Plaintiff and Class Members are or were patients whose medical records and personal information were maintained by, or who received health-related or other services from, Henry Ford and directly or indirectly entrusted Henry Ford with their Private Information.

53.     Plaintiff and the Class Members relied on Henry Ford to implement and follow adequate data security policies and protocols, to keep their Private Information confidential and securely maintained, to use such Private Information solely for business and health care purposes, and to prevent the unauthorized disclosures of the Private Information. Plaintiff and Class Members reasonably expected that Henry Ford would safeguard their highly sensitive information and keep their Private Information confidential.

54.     As described throughout this Complaint, Henry Ford did not reasonably protect, secure, or store Plaintiff's and the Class's Sensitive Information prior to, during, or after the Data Breach, but rather, enacted unreasonable data security measures that it knew or should have known were insufficient to reasonably protect the highly sensitive information Henry Ford maintained. Consequently, cybercriminals circumvented Henry Ford's security measures, resulting in a significant data breach.

**C.      *The Data Breach and Notice Letter***

55.     According to the notices Henry Ford provided to Plaintiff and Class Members, Henry Ford was subject to a cybersecurity attack culminating in phishing attack which provided an unauthorized user with access to certain Henry Ford email accounts containing protected health information on March 30, 2023. *See* Exs. 1 & 2.

56.     On or about May 16, 2023, approximately one-and-a-half month later, Henry Ford discovered that the Data breach may have impacted PHI or PII, as protected health information was contained in the breached email accounts. *Id.* In response to uncovering the initial breach on March 30, 2023, Henry Ford stated that it "immediately began an extensive investigation to determine what happened." And Henry Ford states that "[a]s a result of this incident, we are implementing additional security measures and providing additional training to employees about recognizing the signs of suspicious email and what to do if they receive one." *Id.*

57.     According to Henry Ford's notice to Plaintiff and Class Members, the investigation found the Data Breach,

> Through our forensics investigation, we determined on May 16, 2023 that protected health information was contained in the email boxes and could have been accessed by the bad actor. The information stored on the affected email accounts may have included the following: name, gender, date of birth, age, lab results, procedure type, diagnosis, date of service, telephone number, medical record number and/or internal tracking number.

*Id.*

58.     Henry Ford did not publicly announce the breach until two months after their investigation concluded, and 3.5 months after first discovering the Data Breach. *Id.* On or about July 14, 2023, Henry Ford finally acknowledged the data security incident in a letter to its patients and via a post on its website. *Id.* Moreover, Henry Ford waited until July 14, 2023 to inform its patients even though it had informed the U.S. Department of Health and Human Services Office for Civil Rights ("OCR") a month earlier, on or around June 6, 2023, reporting a "Hacking/IT" incident with its emails systems. *See* note 5, *supra.*

59.     In Henry Ford's Notice of Data Breach it admitted that "an unauthorized individual conducted an email phishing scheme to gain access to business email accounts." *See* Exs. 1 & 2.

60.     Henry Ford identified only the following actions it undertook to mitigate and remediate the harm caused by the Data Breach in its Notice: "we immediately began an extensive investigation to determine what happened . . . As a result of this incident, we are implementing additional security measures and providing additional training to employees about recognizing the signs of suspicious email and what to do if they receive one." *Id.*

61.     As a HIPAA associated business entity that collects, creates, and maintains significant volumes of Private Information, the targeted attack was a foreseeable risk of which Henry Ford was aware and knew it had a duty to guard

against. This is particularly true because this was a targeted cyberattack. It is well-known that healthcare businesses such as Defendant, which collect and store the confidential and sensitive PII/PHI of hundreds of thousands of individuals, are frequently targets of cyberattacks. Further, cyberattacks are highly preventable through the implementation of reasonable and adequate cybersecurity safeguards, including proper employee cybersecurity training. In fact, cyberattacks are frequently caused by a combination of poor user practices, lack of cybersecurity training, and weak passwords or access management.

62. The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data from email accounts, including (among other things) the Private Information of patients, like Plaintiff and Class Members.

63. Despite learning that the Data Breach compromised PII and PHI on March 30, 2023, Henry Ford waited over 3.5 months following its initial detection, and 2 months following the completion of its investigation to notify the impacted individuals of the Data Breach and the need for them to protect themselves against fraud and identity theft. Henry Ford was, of course, too late in the discovery that protected health information had been exposed and subsequent notification of the Data Breach. *See* Exs. 1 & 2.

64. Due to Henry Ford's inadequate security measures and its delayed notice to victims, Plaintiff and Class Members now face a present, immediate, and

ongoing risk of fraud and identity theft that they will have to deal with for the rest of their lives.

65.     Upon information and belief, and based on the type of cyberattack, along with public news reports, it is plausible and likely that Plaintiff's Private Information was stolen in the Data Breach.

66.     Henry Ford had obligations created by HIPAA, contract, industry standards, common law, and its own promises and representations made to Plaintiff and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

67.     Plaintiff and Class Members provided their Private Information to Henry Ford with the reasonable expectation and mutual understanding that Henry Ford would comply with its obligations to keep such information confidential and secure from unauthorized access.

68.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Henry Ford assumed legal and equitable duties and knew, or should have known, that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

69.     Henry Ford's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry preceding the date of the breach.

70. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their personal information. Plaintiff and Class Members would not have allowed Henry Ford or anyone in Henry Ford's position to receive their Private Information had they known that Henry Ford would fail to implement industry standard protections for that sensitive information.

71. As a result of Henry Ford's negligent and wrongful conduct, Plaintiff's and Class Members' highly confidential and sensitive Private Information was left exposed to cybercriminals.

**D.    *Henry Ford Failed to Comply with FTC Guidelines***

72. Henry Ford was prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

73. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

21

74.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[11] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach. *Id.*

75.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

76.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employy

---

[11]    *See Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016).

reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

77.    These FTC enforcement actions include actions against healthcare providers like Henry Ford. *See, e.g.*, *In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.")

78.    Henry Ford failed to properly implement basic data security practices.

79.    Henry Ford's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

80.    Henry Ford was at all times fully aware of the obligation to protect the Private Information of customers and patients. Henry Ford was also aware of the significant repercussions that would result from its failure to do so.

**E.    *Henry Ford Failed to Comply with Industry Standards***

81.    As shown above, experts studying cyber security routinely identify

healthcare providers as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

82.     Several best practices have been identified that at a minimum should be implemented by healthcare providers like Henry Ford, including but not limited to educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

83.     Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

84.     Henry Ford failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity

readiness.

85.    These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Henry Ford failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

**F.    *Henry Ford Violated its HIPAA Obligations to Safeguard the Private Information***

85.    Henry Ford is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

86.    Henry Ford is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[12] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

---

[12]    HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

87.   HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information that is kept or transferred in electronic form.

88.   HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

89.   "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

90.   HIPAA's Security Rule requires Henry Ford to do the following:

   a.   Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

   b.   Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

   c.   Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

   d.   Ensure compliance by its workforce.

91.   HIPAA also requires Henry Ford to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Henry Ford is required under HIPAA to "[i]mplement

technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

92.    HIPAA and HITECH also obligated Henry Ford to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

93.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Henry Ford to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[13]

94.    HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

95.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of

---

[13]    *See* Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last accessed July 21, 2023).

protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

96.     HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[14] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[15]

96.     Title II of HIPAA contains what are known as the Administrative

---

[14]    *See*    http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited July 21, 2023).

[15]    https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited July 21, 2023).

Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Henry Ford left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

97.    A Data Breach such as the one Henry Ford experienced, is considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, ". . . the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI."

*See* 45 C.F.R. 164.40.

98.    The Data Breach resulted from a combination of insufficiencies that demonstrate Henry Ford failed to comply with safeguards mandated by HIPAA regulations.

## G. *Henry Ford Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information*

99.    In addition to its obligations under federal and state laws, Henry Ford owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining,

retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Henry Ford owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

100. Henry Ford owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

101. Henry Ford owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

102. Henry Ford owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

103. Henry Ford owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

104. Henry Ford owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

105. Henry Ford owes a legal duty to secure consumers' PII and PHI and to

timely notify consumers of a data breach.

106.   Henry Ford breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Henry Ford's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.   Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.   Failing to adequately protect customers' Private Information;

c.   Failing to properly monitor its own data security systems for existing intrusions;

d.   Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

e.   Failing to detect unauthorized ingress into its systems;

f.   Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within its systems, including to and from areas containing the most sensitive data;

g.   Failing to detect unauthorized exfiltration of the most sensitive data on its systems;

h.   Failing to train its employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

i.   Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

j.   Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to

allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

k.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

l.  Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

m.  Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

n.  Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

o.  Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

p.  Failing to train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

q.  Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption");

r.    Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

s.    Failing to adhere to industry standards for cybersecurity as discussed above; and

t.    Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

107.  Henry Ford negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems and email accounts which contained unsecured and unencrypted Private Information.

108.  Had Henry Ford remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Henry Ford could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

109.  However, due to Henry Ford's failures, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with Henry Ford.

## H.   *Henry Ford Knew or Should Have Known that Criminals Target Private Information*

110.  Henry Ford's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare

industry and other industries holding significant amounts of PII and PHI preceding the date of the breach.

111.   At all relevant times, Henry Ford knew, or should have known, its patients', Plaintiff's, and all other Class Members' Private Information was a target for malicious actors. Despite such knowledge, Henry Ford failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' Private Information from cyber-attacks that Henry Ford should have anticipated and guarded against.

112.   The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data from email accounts, including (among other things) the Private Information of patients and/or plan Members, like Plaintiff and Class Members.

113.   Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[16]

---

[16]   *2022 Breach Barometer*, PROTENUS,   *see* https://blog.protenus.com/key-takeaways-from-the-2022-breach-barometer (last visited July 21, 2023).

114.    The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[17]

115.    Further, a 2022 report released by IBM Security states that for 12 consecutive years the healthcare industry has had the highest average cost of a data breach and as of 2022 healthcare data breach costs have hit a new record high.[18]

116.    Private Information is a valuable property right.[19] The value of Private Information as a commodity is measurable.[20] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory

---

[17]    Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), available at: https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year (last visited July 21, 2023).

[18]    *Cost of a Data Breach Report 2022*, IBM Security, available: https://www.ibm.com/downloads/cas/3R8N1DZJ (last visited July 21, 2023).

[19]    *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFORMATION AND COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Dat a ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible[.]") (last visited July 21, 2023).

[20]    *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192 (last visited July 21, 2023).

frameworks."[21] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[22] Private Information is so valuable to identity thieves that once Private Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

117.   As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, Private Information, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

118.   PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[23] A cybercriminal who steals a person's PHI can end up with as many

---

[21]    *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last visited July 21, 2023).

[22]    *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/ (last visited July 21, 2023).

[23]    *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAGAZINE (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.") (last visited July 21, 2023).

as "seven to 10 personal identifying characteristics of an individual." A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[24]

119.   All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[25] According to a report released by the FBI Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[26]

120.   According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities

[24]   *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010) (last visited July 21, 2023).

[25]   Adam Greenberg, *Health insurance credentials fetch high prices in the online black market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market (last visited July 21, 2023).

[26]   *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI CYBER DIVISION (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf (last visited July 21, 2023).

continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."

121.   Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."

122.   The HIPAA Journal article goes on to explain that patient records, like those stolen from Henry Ford, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."

123.   Criminals can use stolen Private Information to extort a financial payment by "leveraging details specific to a disease or terminal illness." Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having

healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do." *Id.*

124.   Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[27]

125.   Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

126.   Indeed, cyberattacks against the healthcare industry have been common for over ten years with the Federal Bureau of Investigation ("FBI") warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing

---

[27]   Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), available at: https://www.guanotronic.com/~serge/papers/weis07.pdf (last visited July 21, 2023).

sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[28]

127. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. Entities like and hospitals are particularly attractive to cyberattacks because they often have lesser IT defenses.

128. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[29]

129. Henry Ford was on notice that the FBI has recently been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[30]

---

[28]    Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector (last visited July 21, 2023).
[29]    *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack, Security Magazine* (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited July 21, 2023).
[30]    Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-

130. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[31]

131. As implied by the above AMA quote, stolen Private Information can be used to interrupt important medical services. This is an imminent and certainly impending risk for Plaintiff and Class Members.

132. Henry Ford was on notice that the federal government has been concerned about healthcare company data encryption practices. Henry Ford knew its employees accessed and utilized protected health information in the regular course of their duties, yet it appears that information was not encrypted.

133. The OCR urges the use of encryption of data containing sensitive personal information. As far back as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops

---

fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24 U20140820 (last visited July 21, 2023).

[31] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomeware-attacks-shut-down-clinics-hospitals (last visited July 21, 2023).

containing sensitive personal information. In announcing the fines, Susan McAndrew, formerly OCR's deputy director of health information privacy, stated in 2014 that "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[32]

134.   As a HIPAA covered business, Henry Ford should have known about its data security vulnerabilities and implemented enhanced and adequate protection, particularly given the nature of the Private Information stored in its unprotected files.

## I.   *Cyberattacks and Data Breaches Cause Disruption and Put Consumers at an Increased Risk of Fraud and Identity Theft*

135.   Cyberattacks and data breaches at healthcare companies like Henry Ford are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

136.   Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[33]

137.   Researchers have further found that at medical service providers that

---

[32]   "Stolen Laptops Lead to Important HIPAA Settlements," U.S. Dep't of Health and Human Services (Apr. 22, 2014), available at https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html (last visited July 21, 2023).

[33]   *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks (last visited July 21, 2023).

experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[34]

138.   The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[35]

139.   That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief

---

[34]   *See* Sung J. Choi et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Services Research 971, 971-980 (2019). Available at https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203 (last visited July 21, 2023).

[35]   *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (2007). Available at https://www.gao.gov/new.items/d07737.pdf (last visited July 21, 2023).

can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

140.   Theft of Private Information is serious. The FTC warns consumers that identity thieves use Private Information to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.

141.   The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[36]

142.   Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud,

---

[36]   *See   IdentityTheft.gov*,   Federal   Trade   Commission, https://www.identitytheft.gov/Steps (last visited July 21, 2023).

and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

143.   Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

144.   Moreover, theft of Private Information is also gravely serious because Private Information is an extremely valuable property right.[37]

145.   Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims

---

[37]   *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted) (last visited July 21, 2023).

with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[38]

146.   Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

147.   Each year, identity theft causes tens of billions of dollars of losses to victims in the United States. For example, with the Private Information stolen in the Data Breach, which may include Social Security numbers, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft. These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

---

[38] *See* Federal Trade Commission, *Medical Identity Theft*, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited July 21, 2023).

148.   Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

149.   There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

150.   For example, it is believed that certain highly sensitive personal information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

151.   Cyber criminals may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[39]

---

[39]   *See supra.*

152.   Social security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> **Social Security number:** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refund, employment—even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your lift in so many ways.[40]

153.   For instance, with a stolen Social Security number, which is only one subset of the Private Information compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits. *Id.*

154.   The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. *Id.* Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. *Id.* at 4. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for

---

[40]      *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (emphasis added) (last visited July 21, 2023).

unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

155.   An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[41]

156.   This was a financially motivated Data Breach, as the only reason the cybercriminals go through the trouble of running a targeted phishing attack against companies like Henry Ford is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

---

[41]   Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-hackers-has-millions-worrying-about-identity-theft (last visited July 21, 2023).

49

157.   Indeed, a Social Security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[42] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[43]

158.   The medical information, PHI, which was exposed is also highly valuable. PHI can sell for as much as $363 according to the Infosec Institute.[44]

159.   These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PII, they *will use it. Id.*

160.   Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[45]

161.   Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number,

---

[42]   Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, Nov. 15, 2017, https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web (last visited July 21, 2023).

[43]   *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (last visited July 21, 2023).

[44]   Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at:* https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited July 21, 2023).

[45]   *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last visited July 21, 2023).

a breach victim has to demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the victim has suffered the harm.

162.   Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[46]

163.   Theft of PII is even more serious when it includes theft of PHI. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

164.   Medical identity theft is one of the most common, most expensive, and most difficult-to-prevent forms of identity theft. Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other

---

[46]   Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019, 3:39 PM), https://time.com/5643643/capital-one-equifax-data-breach-social-security/   (last visited July 21, 2023).

records, it can lead to misdiagnosis or mistreatment. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013," which is more than identity thefts involving banking and finance, the government and the military, or education.[47] "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. *Id.* "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities." *Id.*

165.   Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[48] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[49] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use Private Information "to see a doctor, get prescription drugs, buy medical devices, submit claims with your

---

[47]   Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last visited July 21, 2023).

[48]   Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIVACY FORUM 6 (Dec. 12, 2017), https://www.worldprivacyforum.org/2017/12/new-report-the-geography-of-medical-identity-theft/ (last visited July 21, 2023).

[49]   *See supra.*

insurance provider, or get other medical care."[50] The FTC also warns, "If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use. It could also hurt your credit."[51]

166.   A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought nor received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

---

[50]   *See supra.*

[51]   *Id.*

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[52]

167. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

168. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[53]

---

[52]   *See supra*.

[53]   John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 JOURNAL OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf (last visited July 21, 2023).

169.   Cybercriminals can post stolen Private Information on the cyber black-market for years following a data breach, thereby making such information publicly available.

170.   Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened. [54] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[55]

171.   Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[56]

172.   It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their Private Information is forever in cyberspace

---

[54]   *See* Medical ID Theft Checklist, *available at:* https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last visited July 21, 2023).

[55]   Experian, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages"), available at:* https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited July 21, 2023).

[56]   "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf (last visited July 21, 2023).

and was taken by people willing to use the information for any number of improper

purposes and scams, including making the information available for sale on the black

market.

173.   A study by the Identity Theft Resource Center shows the multitude of

harms caused by fraudulent use of personal and financial information.



174.   Victims of the Data Breach, like Plaintiff and Class Members, must

spend many hours and large amounts of money protecting themselves from the

current and future negative impacts to their privacy and credit because of the Data

Breach. *Id.*

175.   As a direct and proximate result of the Data Breach, Plaintiff and Class

Members have had their Private Information exposed, have suffered harm as a result,

and have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiff and Class Members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions and healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

176.   Plaintiff and Class Members have suffered or will suffer actual harms for which they are entitled to compensation, including but not limited to the following:

    a. Actual identity theft, including fraudulent credit inquiries and cards being opened in their names;

    b. Trespass, damage to, and theft of their personal property, including Private Information;

    c. Improper disclosure of their Private Information;

    d. The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their Private Information being in the hands of criminals and having already been misused;

    e. The imminent and certainly impending risk of having their confidential medical information used against them by spam callers to defraud them;

f.  Damages flowing from Henry Ford's untimely (and in some cases, non-existent) and inadequate notification of the Data Breach;

g.  Loss of privacy suffered as a result of the Data Breach;

h.  Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

i.  Ascertainable losses in the form of deprivation of the value of patients' personal information for which there is a well-established and quantifiable national and international market;

j.  The loss of use of and access to their credit, accounts, and/or funds;

k.  Damage to their credit due to fraudulent use of their Private Information; and

l.  Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

177.  Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which remains in the possession of Henry Ford, is protected from further public disclosure by the implementation of better employee training and industry standard and statutorily compliant security measures and safeguards. Henry Ford has shown itself to be wholly incapable of protecting Plaintiff's and Class Members' Private Information.

178.  Plaintiff and Class Members also have an interest in ensuring that their personal information that was provided to Henry Ford is removed from Henry Ford's unencrypted files.

179.   Henry Ford itself acknowledged the harm caused by the Data Breach because it offered Plaintiff and Class Members the inadequate assistance consisting of a call center "that specializes in providing assistance for data security and cybersecurity incidents and services for other industries." *See* Exs. 1 & 2. This limited offer of assistance is, however, inadequate to protect Plaintiff and Class Members from a lifetime of identity theft risk.

180.   Henry Ford further acknowledged, in its letter to Plaintiff and Class Members, that, in response to the Data Breach, Henry Ford is "implementing additional security measures and providing additional training to employees about recognizing the signs of suspicious email and what to do if they receive one." *Id.*

181.   The notice, rather than offering any specific assistance, merely states that "[i]f there are questions, please call our Incident Response Line." *Id.* The notice fails to provide any steps for Class Members to take in an attempt to mitigate the harm caused by the Data Breach. *See id.*

182.   Given the kind of Private Information Henry Ford made accessible to hackers, however, Plaintiff and Class Members are certain to incur additional damages. Because identity thieves have their Private Information, Plaintiff and all Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of

getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[57] None of this should have happened.

183.   Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries. For this reason, Henry Ford knew or should have known about these dangers and strengthened its data security accordingly. Henry Ford was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

### J.   The Data Breach Was Foreseeable and Preventable

184.   Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[58] Yahoo,[59]

---

[57]   *Will a New Social Security Number Affect Your Credit?*, LEXINGTON LAW (Nov. 16, 2015), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html (last accessed July 21, 2023).

[58]   Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/ (last accessed July 21, 2023).

[59]   Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html (last accessed July 21, 2023).

Marriott International,[60] Chipotle, Chili's, Arby's,[61] and others.[62]

185.   Companies in the healthcare industry, such as Henry Ford, have been prime targets for cyberattacks. As early as August 2014, the FBI specifically warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[63]

186.   Henry Ford should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the Private Information that it collected and maintained.

187.   Henry Ford was clearly aware of the risks it was taking and the harm that could result from inadequate data security, and it could have prevented this Data Breach.

---

[60]    Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/ (last accessed July 21, 2023).
[61]    Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b (last accessed July 21, 2023).
[62]    *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html (last accessed July 21, 2023).
[63]    *See supra.*

188.   Data disclosures and data breaches are preventable.[64] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." *Id.* She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]" *Id.*

189.   "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*." *Id.*

190.   In a Data Breach like this, many failures laid the groundwork for the Breach. The FTC has published guidelines that establish reasonable data security practices for businesses. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[65] The guidelines establish that businesses should

---

[64]   Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

[65]   FTC, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-

protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommended that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

191. Upon information and belief, Henry Ford failed to maintain many reasonable and necessary industry standards necessary to prevent a data breach, including the FTC's guidelines. Upon information and belief, Henry Ford also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

---

personal-information.pdf. (last accessed July 21, 2023).

192.   As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense" against cyberattacks "and it is critical to take precautions for protection."[66]

193.   To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Henry Ford could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of cyberattacks, including phishing attempts, and how they are delivered;

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing;

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users;

- Configure firewalls to block access to known malicious IP addresses;

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system;

- Set anti-virus and anti-malware programs to conduct regular scans automatically;

---

[66]   *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed July 21, 2023).

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary;

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares;

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications;

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common cyberattack locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder;

- Consider disabling Remote Desktop protocol (RDP) if it is not being used;

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy;

- Execute operating system environments or specific programs in a virtualized environment; and

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[67]

194.   The threat continues. In August 2022, the Consumer Finance Protection Bureau (CFPB) published a circular on data security. The CFPB noted that

---

[67]   *Id.* at 3-4.

"[w]idespread data breaches and cyberattacks have resulted in significant harms to consumers, including monetary loss, identity theft, significant time and money spent dealing with the impacts of the breach, and other forms of financial distress," and the circular concluded that the provision of insufficient security for consumers' data can violate the prohibition on "unfair acts or practices" in the Consumer Finance Protection Act (CFPA).

195. Further, to prevent and detect cyberattacks, Henry Ford could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most [cyber]attacks;

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net);

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files;

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it;

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them;

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published; and

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[68]

196.    In addition, to prevent and detect cyberattacks, Henry Ford could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**

    - Apply latest security updates
    - Use threat and vulnerability management
    - Perform regular audit; remove privileged credentials

- **Thoroughly investigate and remediate alerts**

---

[68]    *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *previously available at* https://us-cert.cisa.gov/ncas/tips/ST19-001.

- Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**

  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**

  - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**

  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**

  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[69]

197.   Given the substantial amount of PHI and PII that Henry Ford was storing, Henry Ford could and should have implemented all of the above measures

---

[69]   *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last accessed July 21, 2023).

to prevent and detect cyberattacks. These are basic, common-sense email security measures that every business, not only healthcare businesses, should be doing. Henry Ford, with its heightened standard of care, should be doing even more.

198. Specifically, among other failures, Henry Ford had far too much confidential protected health information unencrypted on its systems. Such Private Information should have been segregated into an encrypted system.[70] Indeed, the United States Department of Health and Human Services' Office for Civil Rights urges the use of encryption of data containing sensitive personal information, stating "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[71]

199. Charged with handling sensitive Private Information, including healthcare information, Defendant knew, or should have known, the importance of safeguarding its patients' Private Information that was entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on its patients after a breach. Henry Ford

---

[70] *See, e.g.*, Adnan Raja, *How to Safeguard Your Business Data with Encryption*, Aug. 14, 2018, https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption (last accessed July 21, 2023).

[71] "Stolen Laptops Lead to Important HIPAA Settlements," U.S. Dep't of Health and Human Services (Apr. 22, 2014), available at https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html (last accessed July 21, 2023).

failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

200.   With respect to training, Defendant specifically failed to:

1. Implement a variety of anti-cyberattack training tools, in combination, such as computer-based training, classroom training, monthly newsletters, posters, login alerts, email alerts, and team-based discussions;

2. Perform regular training at defined intervals such as bi-annual training and/or monthly security updates; and

3. Craft and tailor different approaches to different employees based on their base knowledge about technology and cybersecurity.

201.   The Private Information was also maintained on Henry Ford's computer system in emails in a condition vulnerable to cyberattacks, such as through the infiltration of Defendant's systems through phishing attacks. The mechanism of the cyberattack and the potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Henry Ford, and thus Henry Ford was on notice that failing to take reasonable steps necessary to secure the Private Information from those risks left it in a vulnerable position.

202.   In sum, this Data Breach could have readily been prevented through the use of industry standard practice regarding the security of protected health information.

203.   Plaintiff and Class Members entrusted their Private Information to Henry Ford as a condition of receiving healthcare services. Plaintiff and Class Members understood and expected that Henry Ford or anyone in Henry Ford's position would safeguard their Private Information against cyberattacks, delete or destroy Private Information that Henry Ford was no longer required to maintain, and timely and accurately notify them if their Private Information was compromised.

### K.  The Monetary Value of Privacy Protections and Private Information

204.   The fact that Plaintiff's and Class Members' Private Information was stolen means that Class Members' information is likely for sale by cybercriminals and will be misused in additional instances in the future. Indeed, there is already evidence that Plaintiff's Private Information is on the dark web.

205.   At all relevant times, Defendant was well aware that the Private Information it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

206.   As discussed above, Private Information is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[72]

---

[72]   *See* Federal Trade Commission, *Warning Signs of Identity Theft* (Sept. 2018) (last accessed July 21, 2023).

207.   At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[73]

208.   Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 Billion per year online advertising industry in the United States.[74]

209.   The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[75]

---

[73]   *See Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001) (last accessed July 21, 2023).

[74]   *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal (Feb. 28, 2011) (last accessed July 21, 2023).

[75]   *See Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009) (last accessed July 21, 2023).

210.   Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information. The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their Private Information. This business has created a new market for the sale and purchase of this valuable data.

211.   Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[76]

212.   As discussed above, the value of Plaintiff's and Class Members' Private Information on the black market is substantial.

213.   Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment.

---

[76]   *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017) (last accessed July 21, 2023).

214. The ramifications of Henry Ford's failure to keep its patients' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

215. Victims may not realize their identity has been compromised until long after it has happened.[77] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[78]

216. Breaches are particularly serious in healthcare industries, with healthcare related data among the most private and personally consequential, as set forth above.[79]

217. At all relevant times, Defendant was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud.

218. Had Defendant remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by

---

[77] *See Survey on Medical Identity Theft*, Ponemon Institute, June 2012 (last accessed July 21, 2023).
[78] *See The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches*, EXPERIAN, (Apr. 2010) (last accessed July 21, 2023).
[79] *See supra*.

experts in the field, Defendant would have prevented the phishing attack into its systems and, ultimately, the theft of its patients' Private Information.

219.   Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[80] For example, different PII and PHI elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[81] Based upon information and belief, the unauthorized parties utilized the Private Information they obtained through the Data Breach to obtain additional information from Plaintiff and Class Members that was misused.

220.   In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link

---

[80]   *See Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, FED. TRADE COMM'N 35-38 (Dec. 2010) (last accessed July 21, 2023).
[81]   *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

221.   Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information was not involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiff.

222.   Given these facts, any healthcare or other type of entity that transacts business with patients or customers and then compromises the privacy of its patients' or customers' Private Information has thus deprived them of the full monetary value of the transaction with the entity.

223.   Acknowledging the damage to Plaintiff and Class Members, Defendant instructed patients like Plaintiff to call Henry Ford's Incident Response line "that specializes in providing assistance for data security and cybersecurity incidents and services for other industries" if they had any questions. Exs. 1 & 2.

224.   In short, the Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a

variety of unlawful manners, including opening new credit and financial accounts in users' names.

## L. The Data Breach's Impact on Plaintiff and Class Members

225.   Henry Ford received Plaintiff's PII/PHI in connection with providing medical services to them. In requesting and maintaining Plaintiff's PII/PHI for business purposes, Henry Ford expressly and impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiff's PII/PHI. Henry Ford, however, did not take proper care of Plaintiff's PII/PHI, leading to its exposure to and exfiltration by cybercriminals as a direct result of Henry Ford's inadequate data security measures.

226.   On or around July 14, 2023, Henry Ford sent Plaintiff notice concerning the Data Breach. The letter stated that Henry Ford experienced a cybersecurity attack and that the incident may have resulted in unauthorized access to Plaintiff's PII/PHI stored on Henry Ford's systems. The notice stated that the compromised information that was present on the impacted files included one or more of the following data elements: "name, gender, date of birth, age, lab results, procedure type, diagnosis, date of service, telephone number, medical record number and/or internal tracking number." Exs. 1 & 2.

227.   The notice further encouraged Plaintiff to call an Incident Response Line specializing in provide assistance with data security if she had any questions.

228.   Henry Ford's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm, including but not limited to, i.e., the following—Plaintiff immediately devoted (and must continue to devote) time, energy, and money to: closely monitoring her medical statements, bills, records, and credit and financial accounts; changing login and password information on any sensitive account even more frequently than she already does; more carefully screening and scrutinizing phone calls, emails, and other communications to ensure that she is not being targeted in a social engineering or spear phishing attack; searching for suitable identity theft protection and credit monitoring services and paying for such services to protect herself; and placing fraud alerts and/or credit freezes on her credit file. Plaintiff has taken or will be forced to take these measures in order to mitigate her potential damages as a result of the Breach.

229.   Once PII or PHI is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff will need to maintain these heightened measures for years, and possibly her entire life. Consumer victims of data breaches are more likely to become victims of identity fraud.[82]

---

[82]   *See 2014 LexisNexis True Cost of Fraud Study*, LEXISNEXIS (Aug. 2014) (last accessed July 21, 2023).

230.   Plaintiff greatly values her privacy, especially while receiving medical services. Plaintiff and Class Members did not receive the full benefit of their bargain when paying for medical services, and instead received services that were of a diminished value to those described in their agreements with their respective Defendant healthcare institutions for the benefit and protection of Plaintiff and Class Members and their respective Private Information. Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they actually received.

231.   Plaintiff and Class Members would not have obtained medical services from Henry Ford, or paid the amount they did to receive such, had they known that Henry Ford would negligently fail to adequately protect their PII/PHI. Indeed, Plaintiff and Class Members paid Henry Ford for medical services with the expectation that Henry Ford would keep their PII/PHI secure and inaccessible from unauthorized parties. Plaintiff and Class Members would not have obtained services from these medical providers had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from criminal theft and misuse.

232.   Plaintiff and Class Members have lost confidence in their medical provider, Henry Ford, as a result of the Data Breach.

233.   As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise commit the identity theft and misuse of Plaintiff's and Class members' Private Information as detailed above, and Plaintiff and members of the Class are at a heightened and increased substantial risk of suffering identity theft and fraud.

234.   Plaintiff and Class Members are also at a continued risk of harm because their PII/PHI remains in Henry Ford's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Henry Ford fails to undertake the necessary and appropriate data security measures to protect the PII and PHI in its possession.

235.   As a result of the Data Breach, and in addition to the time Plaintiff has spent and anticipate spending to mitigate the impact of the Data Breach on their lives, Plaintiff has also suffered emotional distress from the public release of her PII and PHI, which she believed would be protected from unauthorized access and disclosure. The emotional distress she has experienced includes anxiety and stress resulting from the unauthorized bad actors viewing, selling, and misusing her PII and PHI for the purposes of identity theft and fraud.

236. Additionally, Plaintiff has suffered damage to and diminution in the value of her highly sensitive and confidential PII/PHI—a form of property that Plaintiff entrusted to Henry Ford and which was compromised as a result of the Data Breach Henry Ford failed to prevent. Plaintiff has also suffered a violation of her privacy rights as a result of Henry Ford's unauthorized disclosure of her PHI/PII.

237. The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

238. Some of the injuries and risks associated with the loss of Private Information have already manifested themselves in Plaintiff and other Class Members' lives. Each Class Member received a cryptically written notice letter from Defendant stating that their protect health information was contained within compromised emailed accounts, and so they would need to remain vigilant for fraudulent activity, with no other explanation of where this Private Information could have gone, or who might have access to it.

239. In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Private Information remains secure and is not subject to further misappropriation and theft.

## CLASS ACTION ALLEGATIONS

240. Plaintiffs bring this action on behalf of herself and on behalf of all other persons similarly situated ("the Class").

241. Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

### Nationwide Class

All individuals residing in the United States whose Private Information was compromised as a result of the Data Breach, including all individuals who were sent the Notice of Data Privacy Incident on or around July 14, 2023.

In addition, or in the alternative, Plaintiff propose the following state class:

### Michigan Class

All individuals residing in Michigan whose Private Information was compromised as a result of the Data Breach, including all individuals in Michigan who were sent the Notice of Data Privacy Incident on or around July 14, 2023.

242. Excluded from the Class are Henry Ford's officers and directors; any entity in which Henry Ford has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Henry Ford. Excluded

also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

243. Plaintiff reserves the right to amend or modify the Class or Class definitions as this case progresses.

244. **Numerosity, Fed. R. Civ. P. 23(a)(1)**: The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists hundreds of thousands of individuals, including at least 168,000 individuals who were or are patients of Henry Ford whose sensitive data was compromised in Data Breach.

245. **Commonality, Fed. R. Civ. P. 23(a)(2)**: There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a. Whether Henry Ford unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

    b. Whether Henry Ford failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c. Whether Henry Ford's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, e.g., HIPAA;

d.    Whether Henry Ford's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    Whether Henry Ford owed a duty to Class Members to safeguard their Private Information;

f.    Whether Henry Ford breached the duty to Class Members to safeguard their Private Information;

g.    Whether Henry Ford knew or should have known that its data security systems and monitoring processes were deficient;

h.    Whether Henry Ford should have discovered the Data Breach sooner;

i.    Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Henry Ford's misconduct;

j.    Whether Henry Ford's conduct was negligent;

k.    Whether Henry Ford breached implied contracts with Plaintiff and Class Members;

l.    Whether Henry Ford was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m.    Whether Henry Ford failed to provide notice of the Data Breach in a timely manner, and;

Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

246.  **Typicality, Fed. R. Civ. P. 23(a)(3)**: Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

247. **Adequacy, Fed. R. Civ. P. 23(a)(4)**: Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

248. **Predominance, Fed. R. Civ. P. 23(b)(3)**: Henry Ford has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Henry Ford's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

249. **Superiority, Fed. R. Civ. P. 23(b)(3):** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Henry Ford. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves

judicial resources and the parties' resources, and protects the rights of each Class Member.

250.    Henry Ford has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

251.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Henry Ford failed to timely and adequately notify the public of the Data Breach;

    b.  Whether Henry Ford owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    c.  Whether Henry Ford's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

    d.  Whether Henry Ford's failure to institute adequate protective security measures amounted to negligence;

    e.  Whether Henry Ford failed to take commercially reasonable steps to safeguard consumer Private Information; and

    f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

252.   Finally, all members of the proposed Class are readily ascertainable. Henry Ford has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Henry Ford.

## CAUSES OF ACTION

### FIRST COUNT
**Negligence**
**(On Behalf of Plaintiff and the Nationwide Class or,**
**Alternatively, the Michigan Class)**

253.   Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

254.   Henry Ford required customers, including Plaintiff and Class Members, to submit non-public Private Information in the ordinary course of healthcare services.

255.   By collecting and storing this data in its computer system and network, and sharing it and using it for commercial gain, Henry Ford owed a duty of care to use reasonable means to secure and safeguard its computer system—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Henry Ford's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

87

256. Henry Ford owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

257. Plaintiff and the Class are a well-defined, foreseeable, and probable group of patients that Henry Ford was aware, or should have been aware, could be injured by inadequate data security measures.

258. Henry Ford owed numerous duties to Plaintiff and the Class, including the following:

- to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in its possession;

- to protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

- to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

259. A large depository of highly valuable health care information is a foreseeable target for cybercriminals looking to steal and profit from that sensitive information. Henry Ford knew or should have known that, given its repository of a host of Private Information for hundreds of thousands of patients posed a significant risk of being targeted for a data breach. Thus, Henry Ford had a duty to reasonably safeguard its patients' data by implementing reasonable data security measures to

protect against data breaches. The foreseeable harm to Plaintiff and the Class of inadequate data security created a duty to act reasonably and safeguard the Private Information.

260.   Henry Ford's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Henry Ford and patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Henry Ford was in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

261.   Henry Ford's duty to use reasonable security measures under HIPAA required Henry Ford to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

262.   In addition, Henry Ford has a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as

interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

263.   Henry Ford's duty to use reasonable care in protecting confidential data and protected health information arose not only as a result of the statutes and regulations described above, but also because Henry Ford is bound by industry standards to protect confidential Private Information.

264.   Henry Ford breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Henry Ford includes, but is not limited to, the following:

   a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

   b.   Failing to adequately monitor the security of their networks and systems;

   c.   Failing to ensure that their email system had plans in place to maintain reasonable data security safeguards;

   d.   Failing to have in place mitigation policies and procedures;

   e.   Allowing unauthorized access to Class Members' Private Information;

   f.   Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

   g.   Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

265.   It was foreseeable that Henry Ford's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

266.   Henry Ford's conduct was grossly negligent and departed from reasonable standards of care, including but not limited to, failing to adequately protect the Private Information and failing to provide Plaintiff and Class Members with timely notice that their sensitive Private Information had been compromised.

267.   Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

268.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered damages as alleged above.

269.   Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

270.   Plaintiff and Class Members are also entitled to injunctive relief requiring Henry Ford to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## SECOND COUNT

## Negligence *Per Se*
## (On Behalf of Plaintiff and the Nationwide Class or,
## Alternatively, the Michigan Class)

271.   Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

272.   Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Henry Ford has a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

273.   Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, Henry Ford had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

274.   Pursuant to HIPAA, Henry Ford had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* definition of encryption at 45 C.F.R. § 164.304.

275.   Henry Ford breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

276.   Henry Ford's failure to comply with applicable laws and regulations constitutes negligence per se.

277.   But for Henry Ford's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

278.   The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Henry Ford's breach of its duties. Henry Ford knew or should have known that it was failing to meet its duties, and that Henry Ford's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

279.   As a direct and proximate result of Henry Ford's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**THIRD COUNT**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Nationwide Class or,**
**Alternatively, the Michigan Class)**

280.   Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

281.   Plaintiff and the Class Members entered into implied contracts with Henry Ford under which Henry Ford agreed to safeguard and protect such

information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

282.   Plaintiff and the Class were required to and delivered their Private Information to Henry Ford as part of the process of obtaining medical services provided by Henry Ford. Plaintiff and Class Members paid money, or money was paid on their behalf, to Henry Ford in exchange for services.

283.   Henry Ford solicited, offered, and invited Class Members to provide their Private Information as part of Henry Ford's regular business practices. Plaintiff and Class Members accepted Henry Ford's offers and provided their Private Information to Henry Ford.

284.   Henry Ford accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing medical services to Plaintiff and Class Members.

285.   In accepting such information and payment for services, Plaintiff and the other Class Members entered into an implied contract with Henry Ford whereby Henry Ford became obligated to reasonably safeguard Plaintiff's and the other Class Members' Private Information.

286.   In delivering their Private Information to Henry Ford and paying for healthcare services, Plaintiff and Class Members intended and understood that Henry Ford would adequately safeguard the data as part of that service.

287. Upon information and belief, in its written policies, Henry Ford expressly and impliedly promised to Plaintiff and Class Members that they would only disclose protected information and other Private Information under certain circumstances, none of which related to a Data Breach as occurred in this matter.

288. The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under HIPAA or other state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

289. The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its agents is restricted and limited to achieve an authorized medical purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

290. Plaintiff and the Class Members would not have entrusted their Private Information to Henry Ford in the absence of such an implied contract.

291.   Had Henry Ford disclosed to Plaintiff and the Class that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and the other Class Members would not have provided their Sensitive Information to Henry Ford.

292.   Henry Ford recognized that Plaintiff's and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the other Class Members.

293.   Plaintiff and the other Class Members fully performed their obligations under the implied contracts with Henry Ford.

294.   Henry Ford breached the implied contract with Plaintiff and the other Class Members by failing to take reasonable measures to safeguard their Private Information as described herein.

295.   As a direct and proximate result of Henry Ford's conduct, Plaintiff and the other Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

**FOURTH COUNT**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class or,**
**Alternatively, the Michigan Class)**

296.   Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

297.   This count is pleaded in the alternative to Count 3 (breach of implied contract).

298.   Upon information and belief, Henry Ford funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and the Class Members.

299.   As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Henry Ford.

300.   Plaintiff and Class Members conferred a monetary benefit on Henry Ford. Specifically, they purchased goods and services from Henry Ford and/or its agents and in so doing provided Henry Ford with their Private Information. In exchange, Plaintiff and Class Members should have received from Henry Ford the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

301.   Henry Ford knew that Plaintiff and Class Members conferred a benefit which Henry Ford accepted. Henry Ford profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

302.   Plaintiff and Class Members conferred a monetary benefit on Henry Ford, by paying Henry Ford as part of rendering medical services, a portion of which

was to have been used for data security measures to secure Plaintiff's and Class Members' Personal Information, and by providing Henry Ford with their valuable Personal Information.

303.   Henry Ford was enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Henry Ford instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Henry Ford's failure to provide the requisite security.

304.   Under the principles of equity and good conscience, Henry Ford should not be permitted to retain the money belonging to Plaintiff and Class Members, because Henry Ford failed to implement appropriate data management and security measures that are mandated by industry standards.

305.   Henry Ford acquired the monetary benefit and Personal Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

306.   If Plaintiff and Class Members knew that Henry Ford had not secured their Personal Information, they would not have agreed to provide their Personal Information to Henry Ford.

307.   Plaintiff and Class Members have no adequate remedy at law.

308.   As a direct and proximate result of Henry Ford's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and/or theft of their Personal Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Henry Ford's possession and is subject to further unauthorized disclosures so long as Henry Ford fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a

result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

309.   As a direct and proximate result of Henry Ford's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

310.   Henry Ford should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Henry Ford should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Henry Ford's services.

## FIFTH COUNT
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Michigan Class)

311.   Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

312.   In light of the special relationship between Henry Ford and Plaintiff and Class Members, Henry Ford became a fiduciary by undertaking a guardianship of the Private Information to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to

maintain complete and accurate records of what information (and where) Henry Ford do store.

313.   Henry Ford had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with its patients, in particular, to keep secure their Private Information.

314.   Henry Ford breached its fiduciary duty to Plaintiff and Class Members by failing to diligently discovery, investigate, and give notice of the Data Breach in a reasonable and practicable period.

315.   Henry Ford breached its fiduciary duty to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

316.   Henry Ford breached its fiduciary duty owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

317.   Henry Ford breached its fiduciary duty to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

318.   As a direct and proximate result of Henry Ford's breach of its fiduciary duty, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft

of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Henry Ford's possession and is subject to further unauthorized disclosures so long as Henry Ford fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Henry Ford's services they received.

319.    As a direct and proximate result of Henry Ford's breach of its fiduciary duty, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**SIXTH COUNT**
**VIOLATIONS OF MICHIGAN'S DATA BREACH**
**PROMPT NOTIFICATION LAW**
**(MICH. COMP. LAWS ANN. § 445.72(1), et seq.)**
**(On Behalf of Plaintiff and the Nationwide Class or,**
**Alternatively, the Michigan Class)**

320.   Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

321.   Defendant is required to accurately and notify Plaintiff and Class Members if it discovers a security breach, or receives notice of a security breach (where unencrypted and unredacted Personal Information was accessed or acquired by unauthorized persons), without unreasonable delay under Mich. Comp. Laws Ann. § 445.72(1).

322.   Defendant is a business that owns or licenses computerized data that includes personal information as defined by Mich. Comp. Laws Ann. § 445.72(1).

323.   Plaintiff's and Class Members' personal information (e.g., Social Security numbers) includes personal information as covered under Mich. Comp. Laws Ann. § 445.72(1).

324.   Because Defendant discovered a security breach and had notice of a security breach (where unencrypted and unredacted personal information was accessed or acquired by unauthorized persons), Defendant had an obligation to disclose such in a timely and accurate fashion as mandated by Mich. Comp. Laws Ann. § 445.72(4).

325.   Defendant has stated it was aware of the Data Breach in March 2023. Defendant has also stated that it only became aware that the Data Breach compromised protected PII and PHI in May 2023. However, Defendant did not

notify Plaintiff and the Class until July 14, 2023, approximately 3.5 months after it first learned of the Data Breach, and 2 months after its investigation had confirmed that the Private Information was contained in the compromised email accounts.

326.   As a direct and proximate result of Defendant's violations of Mich. Comp. Laws Ann. § 445.72(4), Plaintiff and Class Members suffered damages as set forth herein.

327.   Plaintiff and Class Members seek relief under Mich. Comp. Laws Ann. § 445.72(13), including, but not limited to, a civil fine of up to $250 for each violation.

**COUNT SEVEN**
**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiff and the Nationwide Class or,**
**Alternatively, the Michigan Class)**

328.   Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

329.   Plaintiff and Class Members have an interest, both equitable and legal, in the Private Information that was conveyed to, collected by, and maintained by Defendant and that was ultimately accessed or compromised in the Data Breach.

330.   As a healthcare provider, Defendant has a special relationship with its patients, like Plaintiff and the Class Members.

331.   Because of that special relationship, Defendant was provided with and stored private and valuable PII and PHI belonging to Plaintiff and the Class, which it was required to maintain in confidence.

332.   Plaintiff and the Class provided Defendant with their Private Information under both the express and/or implied agreement of Defendant to limit the use and disclosure of such Private Information.

333.   Defendant had a common law duty to maintain the confidentiality of Plaintiff's and Class Members' Private Information.

334.   Defendant owed a duty to Plaintiff and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to unauthorized persons.

335.   Plaintiff and Class Members have a privacy interest in their personal and medical matters, and Defendant had a duty not to disclose confidential personal and medical information and records concerning its patients.

336.   As a result of the parties' relationship of trust, Defendant had possession and knowledge of the confidential Private Information of Plaintiff and Class Members.

337.   Plaintiff's and the Class's Private Information is not generally known to the public and is confidential by nature.

338.    Plaintiff and Class Members did not consent to nor authorize Defendant to release or disclose their Private Information to an unknown criminal actor.

339.    Defendant breached the duty of confidence it owed to Plaintiff and Class Members when Plaintiff's and Class's Private Information was disclosed to unknown criminal hackers by way of Defendant's own acts and omissions, as alleged herein.

340.    Defendant breached its duties of confidence by failing to safeguard Plaintiff's and Class Members' Private Information, including by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of the Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the Breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; (h) storing PII, PHI and medical records/information in an unencrypted and vulnerable manner, allowing its

disclosure to hackers; and (i) making an unauthorized and unjustified disclosure and release of Plaintiff's and the Class Members' Private Information to a criminal third party.

341.   But for Defendant's wrongful breach of its duty of confidences owed to Plaintiff and Class Members, their privacy, confidences, and Private Information would not have been compromised.

342.   As a direct and proximate result of Defendant's breach of Plaintiff's and the Class's confidences, Plaintiff and Class Members have suffered or will suffer injuries, including: the erosion of the essential and confidential relationship between Defendant—as a health care provider—and Plaintiff and Class Members as patients; loss of their privacy and confidentiality in their Private Information; theft of their Private Information; costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts; costs associated with purchasing credit monitoring and identity theft protection services; lowered credit scores resulting from credit inquiries following fraudulent activities; costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Defendant's Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on

compromised accounts; the imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals; damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; loss of personal time spent carefully reviewing statements from health insurers and providers to check for charges for services not received, as directed to do by Defendant; and/or mental anguish accompanying the loss of confidences and disclosure of their confidential Private Information.

343. Additionally, Defendant received payments from Plaintiff and Class Members for services with the understanding that Defendant would uphold its responsibilities to maintain the confidences of Plaintiff's and Class Members' Private Information.

344. Defendant breached the confidence of Plaintiff and Class Members when it permitted an unauthorized release and disclosure of their confidential Private

Information and, accordingly, it would be inequitable for Defendant to retain the benefit at Plaintiff's and Class Members' expense.

345.   As a direct and proximate result of Defendant's breach of confidences, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**COUNT EIGHT**
**DECLARATORY RELIEF**
**(On Behalf of Plaintiff and the Nationwide Class or,**
**Alternatively, the Michigan Class)**

346.   Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

347.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those here, that are tortious and violate the terms of the federal statutes described in this Complaint.

348.   An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' Private Information, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from future data breaches that compromise their

Private Information. Plaintiff and the Class remain at imminent risk that additional compromises of their Private Information will occur in the future.

349. The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect consumers' PII and PHI.

350. Defendant still possesses the Private Information of Plaintiff and the Class.

351. Defendant has made no announcement that it has presently changed its data storage or security practices relating to the storage of Plaintiff's and Class Members' Private Information, and in email accounts in particular.

352. To Plaintiff's knowledge, Defendant has made no announcement or notification that it has now remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

353. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Henry Ford. The risk of another such breach is real, immediate, and substantial.

354. The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at Henry Ford, Plaintiff and Class Members

Case 2:23-cv-11758-GCS-CI   ECF No. 1, PageID.111   Filed 07/21/23   Page 111 of 114

will likely continue to be subjected to a heightened, substantial, imminent risk of fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

355.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Henry Ford, thus eliminating the additional injuries that would result to Plaintiff and Class Members, along with other consumers whose Private Information would be further compromised.

356.   Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Henry Ford implement and maintain reasonable security measures, including but not limited to the following:

    a.  Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on Henry Ford's systems on a periodic basis, and ordering Henry Ford to promptly correct any problems or issues detected by such third-party security auditors;

    b.  engaging third-party security auditors and internal personnel to run automated security monitoring;

    c.  auditing, testing, and training its security personnel regarding any new or modified procedures;

    d.  purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

111

e.  conducting regular database scans and security checks; and

f.  routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff pray for judgment as follows:

a) For an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and their counsel as Class Counsel;

b) For equitable relief enjoining Henry Ford from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c) For equitable relief compelling Henry Ford to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Personal Information compromised during the Data Breach;

d) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Henry Ford's wrongful conduct;

e) Ordering Henry Ford to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

f) For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g) For an award of punitive damages, as allowable by law;

h) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i) Pre- and post-judgment interest on any amounts awarded; and,

j) Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: July 21, 2023        Respectfully Submitted,

*/s/ Sharon S. Amonrode*
Sharon S. Almonrode (P33938)
E. Powell Miller (P39487)
Melvin Hollowell (P37834)
**THE MILLER LAW FIRM**
950 W. University Drive, Ste 300
Rochester, MI 48307
(248) 841-2200
ssa@millerlawpc.com
epm@millerlawpc.com
mbh@millerlawpc.com

Jonathan Shub
Benjamin F. Johns
Samantha E. Holbrook
**SHUB & JOHNS LLC**
Four Tower Bridge, 200 Barr Harbor Drive,
Suite 400
Conshohocken, PA 19428
(610) 477-8380
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com

*Attorneys for Plaintiff and
the Putative Class*